UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JONATHAN B. KREISBERG,          :

      Petitioner,          :

V.                              :  Case No. 3:12-CV-1299(RNC)

HEALTHBRIDGE MANAGEMENT, LLC, :
et al.,                         :

      Respondents.         :

**MEMORANDUM OPINION**

Petitioner Jonathan B. Kreisberg, Regional Director of Region 34 of the National Labor Relations Board, brings this petition on the Board's behalf seeking a temporary injunction pursuant to section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), pending the final disposition of unfair labor practice charges contained in a complaint that is the subject of ongoing proceedings before Administrative Law Judge Kenneth Chu.  Both the petition and the underlying complaint allege that HealthBridge Management, LLC, together with health care centers it operates in Connecticut ("Respondents"), have violated and are currently in violation of sections 8(a)(1)(3) and (5) of the Act, 29 U.S.C. §§ 158(a)(1)(3) and (5).  On December 11, 2012, the Court granted the petition for injunctive relief

1

in an oral ruling and subsequent written order (Doc. 47).
This memorandum opinion elaborates on the reasoning
underlying the ruling and order.

I.  Background

In 2003, Healthbridge became manager of six health care
centers in Connecticut,[1] and assumed the prior management's
contracts with the New England Health Care Employees Union,
District 1199, SEIU ("the Union"), which represents
approximately 700 workers at Respondents' facilities.
Pursuant to a reopener in the predecessor contracts,
Respondents attempted to negotiate new contracts with the
Union in 2004.  The centers all went into bankruptcy in
2005, however, and were unable to make payments into the
Union's funds.  Litigation and unfair labor practice charges
ensued.  The parties ultimately reached a settlement, the
terms of which included a collective bargaining agreement
("CBA") between the Union and each center effective from
December 31, 2004 to March 16, 2011.

---

[1] Five of these centers are Respondents here: Danbury
Health Care Center; Long Ridge of Stamford; Newington
Health Care Center; Westport Health Care Center; and
West River Health Care Center.  On June 11, 2012,
Respondents closed a sixth facility, Wethersfield Health
Care Center.

Respondents and the Union operated under these contracts without incident relevant to this litigation until 2010.  In that year (the year before the collective bargaining agreements were set to expire), Respondents instituted several unilateral changes to the terms and conditions of employment of Union employees at various centers.  Among other changes, Respondents subcontracted out their unionized housekeeping and laundry employees only to rehire them at reduced wages and benefits without first bargaining with the Union; laid off employees without providing the Union with the notice required under the CBA; implemented new eligibility standards for employees regarding holiday pay, personal days, vacation days, sick days, and uniform allowance; and discontinued their practice of including lunch breaks in calculating overtime.  Union representatives filed multiple grievances with Respondents alleging that these changes violated the CBA, but the grievances were rejected.  The Union filed charges with the Board alleging that Respondents had violated sections 8(a)(1)(3) and (5) of the Act, and Petitioner issued a complaint on March 21, 2011 ("Complaint I").[2]

_____

[2]The unilateral changes were subsequently found to violate sections 8(a)(1)(3) and (5) of the Act.  See

It was in this context that Respondents and the Union began negotiating a successor CBA on January 25, 2011.  At the first bargaining session, Respondents' lead negotiator, Jonathan Kaplan, proposed changes to 38 of the 39 articles of the predecessor contracts, many of which sought to codify the unilateral changes underlying Complaint I.  These proposed changes included: a substantial expansion of Respondents' management rights; increased flexibility for Respondents' to lay off employees; reductions in minimum wages; elimination of paid lunches; a change in benefit calculations from benefits based on hours actually worked to benefits based on "control hours," which were to be determined weekly by the centers; a doubling from 20 to 40 of the number of hours an employee must work per week to be eligible for benefits; reduced overtime eligibility; a reduction in paid holidays, vacations, and personal days; reduced health benefits; increased employee contributions to the employee health insurance plan; and replacement of the employees' pension plan with a 401(k) plan.  See Affidavit of Suzanne Clark (Doc. 13, Aff. 1 at 2-10); Union's Initial

---

Healthbridge Mgmt., LLC, et al., S. 34-CA-12715, 2012 WL 3144346 (N.L.R.B. Div. of Judges Aug. 1, 2012).

Proposals (Doc. 13, Ex. 1).[3]

The Union's lead negotiator, David Pickus, called Respondents' proposed changes "draconian," a "whole rewrite of the contract," and stated that "because [Respondents] would not provide reasons for making these changes . . . there was nothing the Union could say to respond."  Clark Aff. at 9-11.  Also at this session, and at several subsequent meetings, the Union proposed that Respondents remedy the unilateral changes underlying Complaint I, but these changes remained in effect throughout the negotiations.

Including this initial meeting, the parties held thirty-eight contentious negotiating sessions over the next year and a half.  Petitioner alleges that Respondents bargained in bad faith, largely sticking to their proposals without any economic explanation or justification to the Union.  Respondents claim that the Union engaged in bad faith negotiating tactics, pointing out that the Union refused to move on key issues despite receiving more than

---

[3]According to Petitioner, "Respondents' . . . proposal on healthcare alone would amount to $5,700 a year in health costs for employees making on average . . . $31,000 a year . . . roughly one fourth or more of his or her take-home pay [after taxes]."  Pet. Mem. In Support of Pet. For Temporary Inj. (Doc. 14) at 11.

100 proposals and counter proposals, refused to meet more than two or three days per month and then only in the late afternoon or evening, and persisted in bringing large numbers of boisterous employees to the bargaining sessions. Resp't Mem. In Opp'n (Doc. 14) at 2.

On October 27, 2011, Respondents presented a "Final Offer," which consisted of many of the initial proposals made on January 25, including replacing the Union pension plan with a 401(k). Respondents threatened the Union with a lockout if the Final Offer was not accepted. When the Union refused Respondents' proposal, Respondents locked out employees at West River Health Care Center in Milford, Connecticut on December 13, making it clear that the Union could end the lockout immediately by accepting the Final Offer.

On December 21, 2011, the parties met for their twenty-fourth bargaining session. The Union proposed that all open issues be submitted to binding arbitration. Respondents countered that they would end the lockout, give a three percent wage increase to all employees, and arbitrate all other open issues as long as the Union agreed to replace the pension plan with a 401(k). The Union refused. On December

22, the Union proposed that the employees would agree to contribute small amounts to their health insurance provided Respondents agreed to arbitrate all other issues, including the pension. Respondents countered with some additional economic concessions on December 28, but made no movement on the pension issue. Negotiations then broke off for a period of two months.

On February 29, 2012, Petitioner issued a complaint alleging that Respondents were engaging in bad faith bargaining and that the Milford lockout was unlawful. This complaint has since been merged into the complaint currently pending before ALJ Chu ("Complaint II"). Respondents ended the Milford lockout On April 4.[4] On April 24, Respondents made their "Last, Best, and Final proposals" ("LBFs"), which included significant economic and noneconomic concessions[5]

---

[4]Respondents claim that they agreed to end the lockout because the Union agreed to meet for eight more bargaining sessions. Resp't Opp'n Br. (Doc. 18) at 9. Petitioner contends that Respondents ended the lockout only after learning that Petitioner had submitted the complaint over the lockout to the Board's General Counsel proposing a section 10(j) petition. Pet'r Mem. In Supp. 10(j) Pet. (Doc. 14) at 8.

[5]According to Respondents, these economic concessions included immediate 6 percent wage increases, a total of 8 percent in additional wage increases over the next five years, and a 25 percent match on all employee contributions to a 401(k) plan.

but left the 401(k) in place, as well as the "control hour" benefits standard,[6] reduced holidays and sick leave, and increased employee contributions to health care.  The Union also made concessions at this meeting, including agreeing to drop the penalty clause from its dues check-off proposal.

According to the Union's bargaining notes, on May 1, Kaplan asked Pickus and Union attorney John Creane if there were "no circumstance under which the union would agree to a 401k."  The following dialogue ensued:

> **Pickus:** I think our proposal to you is that we'd like to look at ways to save money and if we can find a way to save 4% [of gross payroll].
> **Creane:** Let me ask this- it appears to the union that you're saying unless you're willing to agree to getting rid of the pension fund that the Employer is not willing to make changes to the other non-economics. Your stance seems part in parcel to you trying to reach the economic conditions of your non-union facilities.
> **Kaplan:** I understand its important to you, I'm just trying to see if you would be willing to settle a contract without the pension in it.
> **Creane:** Realistically, given your proposals, it's hard to imagine- our responses are more reflective of your overall proposals to the union than of the importance or willingness to look at the pension. . . .
> **Kaplan:** We do not see any circumstance under which we can, we're not willing to sign a contract that has the current pension plan and evidently as far as we've seen up until now, you have not been willing to sign a

_____

[6]"By the Union's estimates, 110 employees will be reclassified from full-time to part-time as a result of the "control-hours" definition, affecting . . . eligibility for benefits."  Pet. Mem. In Supp. 10(j) Pet. (Doc 14) at 12.

contract that doesn't have the pension.

**Creane:** Yes, evidently.

**Pickus:** The problem is you have so may things you're trying to take away right now - if you give the workers enough money they might be willing to give up the pension. . . . You said in your letter that the pension was the major issue at stake, the main roadblock- I would say you're not being truthful, that the issues are a lot more than that. . . . So to say that you have tried to reach an agreement and that the pension is the only area of disagreement is just not true.

**Kaplan:** I didn't say it was the only area, there are other points of contention.

**Pickus:** A lot more than that- your proposal is whole sale rape.  Call it what you want to call it. You want to give the workers a few million dollars we can get off the pension.

**Creane:** For clarification on your statement- is there no circumstances under which your client is willing to sign a contract with a defined benefit pension plan- are you talking about current employees or future hires?

**Kaplan:** Any obligation to a pension fund.  Not willing to look at it.

**Creane:** So even if only for current and not future employees - still not acceptable?

**Kaplan:** No.

**Creane:** Apart from money is there any other factor?

**Kaplan:** Monetary

**Creane:** If we found equivalent in other area, though, you say that you're still not willing to do that?

**Kaplan:** the problem with these types of pensions id that they're open holes in the future.  Everywhere everyone all over the country trying to get out of them.

Bargaining Notes of Suzanne Clark ("Clark Notes") (Doc. 37-14) at 362-63.

At the May 15 bargaining session, Kaplan again asked

the Union negotiators if the Union had changed its position

on the pension issue.  Pickus responded:

> [N]o, as I said we're not willing to negotiate with
> ourselves.  Your proposal has so many givebacks and so
> many illegal proposals . . . I don't see that what
> you're saying is helpful.  When you change that stance
> we have movement to make, but so far we haven't seen
> any movement from you. . . .We're not willing to talk
> about the pension in a vacuum.

Id. at 366.  In a May 18 letter to Pickus, Respondents

stated that they believed their proposals were "completely

lawful" and the Union was "fully capable of accepting them,"

as evidenced by the fact that the Union "ha[d] agreed to

contracts with other nursing center providers that contain

the same or similar economic terms as those in the [LBFs]."

Pet'r Ex. (Doc. 13) (P-11).  Respondents informed Pickus

that "If [the Union] maintains its current position and

continues to refuse to make any further proposals, then it

appears that [Respondents] and [the Union] have reached an

impasse in their negotiations."  Id.  In its May 18 response

letter, the Union labeled Respondents' suggestion that

impasse had been reached as a "self-serving and disingenuous

characterization."  As evidence of the Union's willingness

to compromise on the pension issue, the letter pointed to

the hypothetical two-tier pension approach that Creane had

proposed at the May 1 meeting, "with current Union employees

remaining in the defined benefit Pension Plan, and new hires

going into a 401 K Plan."  Pet'r Ex. (Doc. 13) (P-12).

At the penultimate bargaining session on May 22, Kaplan again asked if the Union was considering accepting Respondents' 401(k) proposal.  Pickus answered "we told you before[,] depending on the overall proposal we would consider anything. . . . We need to understand your bargaining position."  Clark Notes at 368.  On June 16, Respondents sent a letter to the Union officially declaring impasse and announcing that Respondents would be implementing their LBFs.  Upon Respondents' implementation of these LBF proposals on June 17, the Union provided Respondents with a ten-day notice that it would conduct an unfair labor practice strike.  On June 22, the Union unconditionally offered to cancel the upcoming strike and continue working under the terms and conditions of employment in effect on June 16, 2012.  Respondents informed the Union by letter on June 28 that any employee who went on strike would be permanently replaced.  On July 3, the Union declared an unfair labor practice strike, with approximately 700 Union employees participating.  On July 6, Petitioner amended Complaint II to include allegations that Respondents had implemented their LBFs in the absence of genuine, lawful

11

impasse.  On July 19, the Union again offered to end the strike and return to the pre-LBF conditions, but Respondents refused.  Respondents' brought in temporary workers, and had replaced all the Union strikers by the end of July.

In mid-July, Petitioner sought authorization from the Board to initiate section 10(j) proceedings.  While the request was pending, Administrative Law Judge Steven Fish found that all of Respondents' 2010 unilateral changes forming the basis of Complaint I violated the Act and constituted unfair labor practices.  See Healthbridge, 2012 WL 3144346.  Thereafter, on August 16, authorization for this 10(j) proceeding was provided by both the Board and the Board's Acting General Counsel.  Petitioner then filed the instant petition.

The petition charges that Respondents have engaged in unfair labor practices in violation of sections 8(a)(1)(3) and (5) of the Act.  The petition points to Respondents' implementation of their LBF proposals without reaching impasse, the 2010 unilateral changes to employment conditions found unlawful by Judge Fish, and Respondents' lockout of employees at the West River facility.  Petitioner asks the Court to order Respondents to reinstate the

striking Union employees at their previous wages and benefits, restore the terms and conditions of employment that predated Respondents' unilateral implementation of the LBFs, and bargain in good faith with the Union.[7]

The filing of the petition led to an initial round of briefing.  An extensive record was also presented to the Court consisting of affidavits, correspondence, contract proposals, and bargaining notes of the parties.  A hearing was held on October 22.  At the hearing, Petitioner presented oral argument.  Respondents presented oral argument and made an offer of proof regarding anticipated

---

[7]Respondents argue that the Court should not grant equitable relief because Petitioner's delay in bringing the petition exacerbated the harm sought to be prevented.  The argument lacks merit.  See Kaynard v. MMIC, Inc., 734 F.2d 950, 954 (2d Cir. 1984) ("There is no merit whatsoever in the company's final contention that the delays [2 months between the Board filing a complaint against the employer and the Regional Director bringing a 10(j) petition]  have rendered [injunctive relief] inappropriate. The Board does not take lightly the commencement of a § 10(j) action."); Maram v. Universidad Interamericana De Puerto Rico, Inc., 722 F.2d 953, 960 (1st Cir. 1983) ("A busy administrative agency cannot operate overnight.  The very fact that it must exercise discretion . . . indicate[s] that it should have time to investigate and deliberate. . . . We must reject the [district] court's reliance on the four months delay.").

testimony by Mr. Kaplan.  Respondents requested leave to

file a supplemental written brief and additional exhibits.[8]

Respondents subsequently filed an extensive supplemental

brief, with affidavits and bargaining notes attached, along

with a motion to dismiss for lack of subject matter

jurisdiction.  After carefully reviewing the parties'

submissions and the underlying record, the Court issued an

oral ruling on December 11, denying Respondents' motion to

---

[8]In their submissions, Respondents argue that the Court
should have granted them expedited discovery and the
opportunity to hold an evidentiary hearing because of the
hotly contested facts at issue in this case.  The argument
is unavailing for several reasons.  First, the statutory
policies underlying section 10(j) call for expedited
proceedings and deference to the Regional Director, even
when facts are disputed.  See Kaynard v. Mego, 633 F.2d
1026, 1031 (2d. Cir. 1980); Dunbar for & on Behalf of
N.L.R.B. v. Landis Plastics, Inc., 977 F. Supp. 169, 176
(N.D.N.Y, 1997) ("[10(j)] injunction proceedings in federal
court must not evolve into a hearing on the merits of the
unfair labor practice charges because the district court
must not usurp the NLRB's role.").      Second, unlike
applications for injunctions by private parties that reach
the judiciary without any prior screening, section 10(j)
petitions are investigated by the Board before they are
filed in court.  Notably, Respondents refused to participate
in the Board's investigation.  See Tr. Oral Argument of
10/22/12 (Doc. 35) at 19 ("[W]e got no cooperation from the
employer, we never got their notes. We got some position
statements, we got some nice letters with some legalese from
the lawyers, and we got some copies of some of the
proposals, but we didn't hear their side of things because
they didn't want to give it.").

dismiss[9] and granting the petition for injunctive relief.

II.   Standard of Review

Section 10(j) authorizes district courts to grant temporary injunctions pending the outcome of unfair labor practice proceedings before the Board.  29 U.S.C. § 160(j). "The Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court . . . for appropriate temporary relief."  29 U.S.C. § 160(j).  While an extraordinary remedy, 10(j) reflects Congress's recognition that, in the absence of injunctive relief, the Board's often lengthy administrative proceedings could render a final Board order ineffectual. Silverman v. Major League Baseball Player Relations Comm., Inc., 880 F. Supp. 246, 252-53 (S.D.N.Y. 1995) aff'd, 67 F.3d 1054 (2d Cir. 1995).

In reviewing a section 10(j) petition, the legal

_____

[9]Respondents motion to dismiss for lack of subject matter jurisdiction was fully addressed and denied in the Court's oral ruling (Doc. 49).  The Court rejected Respondents' argument that the Board's General Counsel lacked authority to authorize a 10(j) petition in this case for substantially the reasons stated in Paulsen v. Renaissance Equity Holdings, LLC, 849 F. Supp. 2d 335, 350 (E.D.N.Y. 2012) (finding that the Board's November 2011 delegation to the General Counsel constituted valid authority to bring a 10(j) petition under the NLRA).

standard is two-pronged: the court must determine (1) whether there is reasonable cause to believe that unfair labor practices have been committed and, if so, (2) whether the requested relief is 'just and proper.' Kaynard v. Mego Corp., 633 F.2d 1026, 1030 (2d Cir. 1980). Respondents argue that following the Supreme Court's decision in Winter v. Natural Res. Def. Council Inc., 555 U.S. 7 (2008), the traditional two-prong test should be replaced by a more demanding four-part test. See id. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). Adopting the stricter approach urged by Respondents would be inconsistent with the remedial purposes of section 10(j), see Chester ex rel. N.L.R.B. v. Grane Healthcare Co., 666 F.3d 87, 96 (3d Cir. 2011),[10] as well as Second Circuit precedent. See

_____

[10]In Chester, the Third Circuit recently stated that: "Congress' clear purpose in creating § 10(j) was not to limit the scope of the Board's authority to decide violations, but to preserve its powers to do so by giving the NLRB an opportunity to seek an injunction of alleged violations before an injury becomes permanent or the Board's remedial purpose becomes meaningless. . . . Section 10(j) does not so expand the scope of the district court's role in labor disputes as to permit it

Mattina ex rel. N.L.R.B. v. Kingsbridge Heights Rehab. &
Care Ctr., 329 F. App'x 319, 322 (2d Cir. 2009).

   *A. Reasonable Cause*

   Courts in this Circuit owe considerable deference to
the Board's Regional Director when determining whether
reasonable cause exists.  Hoffman ex rel. N.L.R.B. v. Inn
Credible Caterers, Ltd., 247 F.3d 360, 365 (2d Cir. 2001).
The Regional Director need only present evidence "sufficient
to spell out a likelihood of violation" to satisfy the
reasonable cause requirement.  Danielson v. Joint Bd. of
Coat, Suit and Allied Garment Workers' Union, 494 F.2d 1230,
1243 (2d Cir. 1974); Silverman, 67 F.3d at 1059 ("The court
need not make a final determination that the conduct in
question is an unfair labor practice.").  Even when disputed
issues of fact exist, "the Regional Director's version of
the facts should be sustained if within the range of
rationality, . . . inferences from the facts should be drawn
in favor of the charging party."  Mego, 633 F.2d at 1031;
Blyer v. Pratt Towers, Inc., 124 F. Supp. 2d 136, 143
(E.D.N.Y. 2000) ("In making its determinations, the Court

─────────────

   to intrude upon the Board's exclusive authority to
   decide the merits of the cases. . . . We do not believe
   the Court intended its decision[] in . . . Winter to
   extend to the context of such a distinct statutory
   scheme." 666 F.3d at 96.

should give the Regional Director's interpretation of the
facts the benefit of the doubt.").  By its very nature, the
"reasonable cause" prong contemplates that a 10(j)
injunction will be issued despite the existence of
unresolved issues before the Board.  Kingsbridge Heights,
329 F. App'x at 322.  Even with respect to issues of law,
"the Regional Director is not required to show that . . .
the precedents governing the case are in perfect harmony,"
and "the district court should be hospitable to the views of
the [Regional Director], however novel."  Mego, 633 F.2d at
1031-33.  A district court should decline to grant relief
only if convinced that the NLRB's legal or factual theories
are "fatally flawed."  Hoffman v. Polycast Tech. Div. of
Uniroyal Tech. Corp., 79 F.3d 331, 333 (2d Cir. 1996).

B. *Just and Proper*

"Injunctive relief under § 10(j) is just and proper
when it is necessary to prevent irreparable harm or to
preserve the status quo."  Kingsbridge Heights, 329 F. App'x
at 321.  The status quo that requires protection under §
10(j) is the status quo as it existed before the onset of
the alleged unfair labor practices, not the status quo that
has come into being as a result of the unfair labor

18

practices being litigated.  Inn Credible Caterers, 247 F.3d
at 360 (2d Cir. 2001); Seeler v. Trading Port, Inc., 517
F.2d 33, 38 (2d Cir. 1975).  The Second Circuit has made it
clear that courts should review petitions in § 10(j) cases
"in accordance with traditional equity practice, as
conditioned by the necessities of public interest which
Congress has sought to protect."  Morio v. N. Am. Soccer
League, 632 F.2d 217, 218 (2d Cir.1980) (per curiam)
(internal quotation marks omitted).  Thus, in applying the
just and proper standard, it is necessary to consider "the
context of federal labor laws" and the "underlying purposes
of § 10(j)," specifically, the "protect[ion of] employees'
statutory collective bargaining rights," and the prevention
of "irreparable harm to the union's position in the
[workplace] [and] to the adjudicatory machinery of the
NLRB."  Inn Credible Caterers, 247 F.3d at 368; see also
Kreisberg ex rel. N.L.R.B. v. Stamford Plaza Hotel &
Conference Ctr., L.P., 849 F. Supp. 2d 279, 283-84 (D. Conn.
2012) ("The disappearance of the 'spark to unionize' may be
an irreparable injury for the purposes of § 10(j).").

        Consistent with these policies, the proper plaintiff in
a proceeding under section 10(j) is the Regional Director

rather than the individual employees.  Inn Credible
Caterers, 247 F.3d at 369.  The Regional Director's judgment
that injunctive relief is necessary to promote the
effectiveness of the Board's remedial procedures receives
deference, especially in cases concerning fundamental and
well-established tenets of federal labor law where "the
prevailing legal standard is clear and the only dispute
concerns the application of that standard to a particular
set of facts."  Mattina ex rel. N.L.R.B. v. Kingsbridge
Heights Rehab. & Care Ctr., 08 CIV. 6550 (DLC), 2008 WL
3833949 (S.D.N.Y. Aug. 14, 2008) aff'd, 329 F. App'x 319 (2d
Cir. 2009).

III.  Discussion

    A.  Is there reasonable cause to believe Respondents
       have violated the Act?

The petition is based on Petitioner's determination
that Respondents violated §§ 8(a)(1)(3) and (5) of the Act,
when they unilaterally imposed new conditions on the Union
on June 17, 2012, without first reaching lawful impasse.
Accordingly, the first inquiry is whether the record before
the Court provides reasonable cause to believe that lawful
impasse had not been reached.

*i.  Did the parties bargain to impasse?*

The duty to bargain collectively is defined in § 8(d) of the Act as the "mutual obligation of the employer and the representative of the employees to . . . confer in good faith."  29 U.S.C. § 158(d).  The Supreme Court has divided the subjects of collective bargaining into two categories: mandatory and permissive.  See N.L.R.B. v. Wooster Div. of Borg Warner Corp., 356 U.S. 342, 349 (1958).  Mandatory subjects include rates of pay, wages, hours of employment, and other conditions of employment such as retirement and pension plans.  See Inland Steel Co. v. N.L.R.B., 170 F.2d 247 (7th Cir. 1948) aff'd sub nom. Am. Communications Ass'n, C.I.O., v. Douds, 339 U.S. 382 (1950) (citing NLRA §§ 8(a)(5), 9(a)).  "When a collective agreement expires, an employer may not alter terms and conditions of employment involving mandatory subjects until it has bargained to an impasse over new terms."  Kingsbridge Heights, 2008 WL 3833949 at *20; see also Carpenter Sprinkler Corp. v. N.L.R.B., 605 F.2d 60, 64 (2d Cir. 1979) ("Unilateral action by an employer concerning subjects of mandatory bargaining is a violation of the duty to bargain in good faith, in the

absence of a true impasse in negotiations.").

    "Impasse," in the collective bargaining context, is an

imprecise term of art:

> The definition of an 'impasse' is understandable
> enough — that point at which the parties have
> exhausted the prospects of concluding an agreement
> and further discussions would be fruitless — but
> its application can be difficult. Given the many
> factors commonly itemized by the Board and courts
> in impasse cases, perhaps all that can be said
> with confidence is that an impasse is a 'state of
> facts in which the parties, despite the best of
> faith, are simply deadlocked.' The Board and
> courts look to such matters as the number of
> meetings between the company and the union, the
> length of those meetings and the period of time
> that has transpired between the start of
> negotiations and their breaking off. There is no
> magic number of meetings, hours or weeks which
> will reliably determine when an impasse has
> occurred."

Laborers Health & Welfare Trust Fund For N. California v.

Advanced Lightweight Concrete Co., Inc., 484 U.S. 539, 544

(1988) (citing R. Gorman, *Basic Text on Labor Law:*

*Unionization and Collective Bargaining* 448 (1976)).  Put

more succinctly, "an impasse is a situation where good-faith

negotiations have exhausted the prospects of concluding an

agreement."  Anderson Enterprises, 329 NLRB 760, 823 (1999).

For impasse to occur, both parties must be unwilling to

compromise.  Grinell Fire Protection Sys. Co., 328 NLRB 585,

586 (1999).  When one party makes concessions and evinces a willingness to compromise further "it would be both erroneous as a matter of law and unwise as a matter of policy . . . to find impasse merely because the party is unwilling to capitulate immediately and settle on the other party's unchanged terms."  Id.  Although impasse on a single critical issue can create impasse on an entire agreement, impasse on this critical issue must lead to a breakdown in the overall negotiations.  Erie Brush & Mfg. Corp. v. N.L.R.B., 700 F.3d 17, 21 (D.C. Cir. Nov. 27, 2012).

The requirement that a clear impasse be reached before unilateral changes in the terms of employment are made exists to protect the integrity of the collective bargaining process.  Carpenter, 605 F.2d at 65.  Whether impasse has been reached "is a question of fact peculiarly suited to the NLRB's expertise," Carpenter, 605 F.2d at 65, and the burden of proving the existence of an impasse rests on the party asserting it.  CJC Holdings Inc., 320 NLRB 1041, 1044 (1996).

Petitioner advances two distinct legal theories to support his conclusion that Respondents have violated the

Act: no impasse existed in fact, and no impasse existed as a matter of law.

> a.  *No impasse in fact*

It is undisputed that the terms and conditions of employment imposed by Respondents in their Last, Best and Final proposals constitute mandatory bargaining subjects. Petitioner urges that the record provides reasonable cause to believe that the imposition of these LBFs was unlawful because the parties did not, in fact, bargain to impasse as evidenced by the Union's demonstrated willingness to make movement on the pension and other issues after Respondents proposed their LBFs on April 24.  Respondents contend that the record clearly demonstrates that neither party was willing to compromise on the pension issue and point to the lengthy negotiating period and number of bargaining sessions as objective indicia that further negotiations would have been futile.  Respondents point to the Union's notes of the May 1 bargaining session as support for their position.

These notes reflect that Mr. Creane said it would be hard to imagine the Union agreeing to any contract with Respondents that did not have the pension in it, but he qualified his statement by adding that the Union's

"responses are more reflective of [Respondents'] overall proposals to the union than of the importance or willingness to look at the pension."  Clark Notes at 362-363.  The May 1 notes also show that the Union offered to figure out a way to save Respondents four percent of gross payroll, Pickus stated the Union would consider giving up the pension if Respondents would give the employees a few million dollars, and Creane asked Respondents if they would consider a two-tiered system in which current employees would retain their pensions while new employees would enroll in the 401(k) plan.  Id.  Respondents dismiss the Union's proposal to save four percent of payroll as a "bare promise," claim that Pickus actually said the Union would only give up the pension if Respondents gave "each worker" a few million dollars, and argue that Crean's two-tiered pension/401(k) hypothetical was not a proposal but merely a request for clarification of Respondents' position.

The burden of proving that the parties reached impasse on the pension issue, and that this impasse led to a breakdown in the overall negotiations, lies with Respondents.  Erie Brush, 700 F.3d at 21.  Whether a party has met this burden is a question Petitioner is particularly

25

well suited to evaluate.  Carpenter, 605 F.2d at 65; see
also, Mego, 633 F.2d at 1031.  With this in mind, I find
that the record provides reasonable cause to believe that
the Union was willing to compromise further when Respondents
declared impasse on June 17.  Objectively viewed, the notes
of the May bargaining sessions show that the Union was
signaling a willingness to make concessions to retain the
pension plan, to compromise on the pension plan, or to give
up the pension plan altogether if offered enough economic
concessions in exchange.  In fact, it is undisputed that the
Union has signed agreements with other nursing center
employers that do not include a pension plan.

*b. No impasse in law*

Petitioner argues that Respondents could not declare
impasse due to unremedied unfair labor practices.  The law
is clear that "a lawful impasse cannot be reached in the
presence of unremedied unfair labor practices."  In Re Titan
Tire Corp., 333 NLRB 1156, 1158 (2001).  An employer that
has committed unfair labor practices cannot "parlay an
impasse resulting from its own misconduct into a license to
make unilateral changes."  Id. (quoting Wayne's Dairy, 223
NLRB 260, 265 (1976)).  Yet not all unremedied unfair labor

26

practices committed during negotiations will give rise to
the conclusion that impasse was declared improperly.  "Only
serious unremedied unfair labor practices preclude
declaration of impasse." Westin Providence Hotel, 38 NLRB
AMR 81.  Unremedied ULPs are serious when they "increase
friction at the bargaining table. . . . [or,] by changing
the status quo, . . . move the baseline for negotiations and
alter the parties' expectations about what they can achieve,
making it harder for the parties to come to an agreement."
Alwin Mfg. Co., Inc. v. N.L.R.B., 192 F.3d 133, 139 (D.C.
Cir. 1999).

Petitioner argues that the unfair labor practices
underlying Complaint I, later found unlawful by ALJ Fish,
were unremedied at the time of bargaining and undermined the
Union's ability to effectively represent its employees.
Petitioner claims that these unfair labor practices caused
negotiations to start off badly when Respondents' refused to
discuss them with the Union, weakened the Union's bargaining
position, and antagonized Union representatives such that
bargaining sessions were characterized by accusations of bad
faith and lawbreaking.  Respondents argue that no causal
connection exists between the unfair labor practices found

27

by Judge Fish and the impasse at issue here because the unfair labor practices occurred well before bargaining began, were discussed only in passing in several bargaining sessions, and were unrelated to the pension plan.  While Respondents' characterization may be factually accurate, it is devoid of legal significance.  The relevant inquiry is whether the existence of these unremedied unfair labor practices increased friction at the bargaining table and made it harder for the parties to agree.

Judge Fish's factual findings and legal conclusions show that in 2010, only months before the negotiations at issue here began, Respondents subcontracted employees and rehired them at reduced wages and benefits, terminated employees without contractually mandated notice to the Union, and unilaterally changed significant terms and conditions of employment in violation of the parties' collective bargaining agreement.  See Healthbridge Mgmt., LLC et al., S. 34-CA-12715, 2012 WL 3144346 (N.L.R.B. Div. of Judges Aug. 1, 2012).  The Union filed internal grievances with Respondents over these practices to no avail.  It is undisputed that these unilateral changes remained in place during the parties' negotiations for

successor contracts and that many were incorporated into the proposals that precipitated the West River lockout as well as the LBFs.  It is reasonable to believe that Respondents' unfair labor practices, while not directly related to the pension issue, could indeed increase friction at the bargaining table and make it more difficult for the parties to reach agreement on any issue.  Accordingly, there is reasonable cause to believe that Respondents' unilateral implementation of its LBFs constituted an unfair labor practice.

   *B.  Is injunctive relief just and proper?*

   Petitioner urges that injunctive relief restoring the status quo is necessary to prevent irreparable harm because support for the Union is currently eroding and will continue to erode if the Union is perceived as being unable to adequately protect the employees or affect their working conditions.  Since the strike began on July 3, between fifty and seventy-five employees have crossed picket lines and at least ten employees have resigned from the Union. Petitioner argues that by the time the Board issues its final ruling on Complaint II, it will be too late to regain the original status quo with the same relative bargaining

position of the parties, making meaningful collective bargaining impossible and effectively rewarding Respondents for their unfair labor practices.  These are exactly the harms the 10(j) mechanism was designed to prevent.  See Inn Credible Caterers, 247 F.3d at 368-69.  Respondents argue that the potential harm to patients at Respondents' health care facilities and harm to Respondents' finances are equitable considerations that outweigh any potential harm to the Union and make injunctive relief improper.

      *i.  Patient safety*

Respondents allege that, before striking, Union employees performed acts of sabotage such as mixing up the names on Alzheimer patients' doors, photos, and wristbands to confuse the new employees; stealing and hiding medical equipment; and breaking patient lifts.  Respondent has submitted an affidavit from Registered Nurse Lorraine Mulligan stating that "a court order requiring the reinstatement of any of these striking workers who engaged in such sabotage and those who had knowledge of it and failed to act, could expose the residents to immediate danger and put them at risk of suffering serious harm or death."  Mulligan Aff. (Doc. 27)

30

The right to reinstatement is not absolute and an employer may refuse to reinstate a specific unfair labor practice striker if the employer can demonstrate that the striker engaged in "serious misconduct" during the course of the strike. <u>Mattina</u>, 2008 WL at *27 (allowing hearings for evidence of misconduct by particular strikers only). Respondents allegations of sabotage by union members are thus far unsubstantiated. Respondent has not submitted any evidence that Union employees committed sabotage, nor have they identified any suspected employees. Furthermore, it is undisputed that since the strike began Respondents have actively encouraged employees to cross picket lines and return to work. It is also undisputed that more than fifty employees have responded to this encouragement by returning to work.

Respondents also urge the Court to consider a related equitable argument, that patients prefer the replacement employees to the strikers. Assuming patients have such a preference, it does not justify withholding injunctive relief necessary to adequately serve the purposes of 10(j).

> *ii.  Financial hardship*

Pointing to the health centers' net operating losses in 2011 under the predecessor contracts, Respondents' argue that restoration of the June 16, 2012 terms and conditions of employment would significantly harm Respondents' financial stability.  Respondents have operated since 2004 under the terms of the contracts with the Union as they existed on June 16, 2012, and never made these arguments of potential financial calamity to the Board when it conducted its 10(j) investigation or to the Union at the negotiating table.[12]

Granting the petition will have a significant impact on Respondents' replacement workers.  The Court is not insensitive to their interests.  It is well settled, however, that the right to interim reinstatement of workers striking in response to an unfair labor practice are superior to the interests of workers hired to replace them. See Aguayo for & on Behalf of N.L.R.B. v. Tomco Carburetor Co., 853 F.2d 744, 750 (9th Cir. 1988) overruled on other grounds by Miller for & on Behalf of N.L.R.B. v. California

---

[12]  At the May 26, 2011 bargaining session Respondents' lead negotiator, Jonathan Kaplan, stated to Union negotiators "with respect to the pension . . . did you hear me say we can't afford it? . . . if I said that we'd have to open up our books, we're not pleading an inability to pay." Clark Notes at 159.

Pac. Med. Ctr., 19 F.3d 449 (9th Cir. 1994).

Finally, this is not, as Respondents' argue, a case in which Petitioner has sought interim relief in support of an unprecedented application of the Act.  This case concerns fundamental and well-established questions of labor law, whether impasse was reached and whether strikers should be reinstated, where "the prevailing standard is clear and the only dispute concerns the application of that standard to a particular set of facts."  Mattina, 2008 WL 3833949 at *25 (reinstating employees and requiring employer to bargain in good faith).[13]  "In such cases, deference to the Regional Director's considered decision that injunctive relief is necessary to insure the effectiveness of the NLRB's remedial procedures and to further the policies of the act is

---

[13]Contrary to respondents' assertions, cases where "a federal judge has issued a 10(j) injunction directing the respondent to 'bargain in good faith'" are not rare. Between 2001 and 2005, the NLRB brought four cases alleging failure to bargain in good faith in violation of Section 8(a)(5) or 8(b)(3) involving "a wide variety of violations." *End-of-Term Report on Utilization of Section 10(j) Injunction Proceedings June 1, 2001, through December 31, 2005*, Memorandum GC 06-02, 2006 WL 118303 at *9 (January 6, 2006).  The NLRB was successful in all four cases.  See e.g., Miller v. Renzenberger, Inc., CIV. S-04-1518 WBS PAN (E.D. Ca. September 16, 2004) (issuing an interim bargaining order and a reinstatement order where respondent had failed to bargain in good faith).

'especially appropriate.'" <u>Id.</u> (quoting <u>Silverman v. 40-41</u>
<u>Realty Associates, Inc.</u>, 668 F.2d 678, 679 (2d Cir. 1982)).

IV.  <u>Conclusion</u>

Accordingly, there is reasonable cause to believe that
Respondents have failed and refused to bargain with the
Union in good faith as alleged in the petition, and the
requested injunctive relief is just and proper.


Date: December 14, 2012        _____/s/RNC_____
                                    Robert N. Chatigny
                               United Stated District Judge